UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LOCKHEED MARTIN CORPORATION,
Owner of the Little Toot II for Exoneration
from or Limitation of Liability,

Plaintiff,

v.                                                        5:02  - CV - 734 (NPM / GJD)

UNKNOWN RESPONDENTS, et al.,
LORRAINE MORGANTI as
Administratix on behalf of the Estate of
Rocco Morganti, Claimant,

Defendants.

APPEARANCES                          OF COUNSEL

BOND, SCHOENECK & KING, PLLC     JONATHAN B. FELLOWS, ESQ.
Attorney for Plaintiff
One Lincoln Center
Syracuse, New York        13202

KREINDLER & KREINDLER, LLP       DANIEL O. ROSE, ESQ.
Attorney for Plaintiff
100 Park Avenue
New York, New York        10017

KREINDLER & KREINDLER, LLP       MARC S. MOLLER, ESQ.
Attorney for Plaintiff
100 Park Avenue
New York, New York        10017

1

NEAL P. McCURN, Senior U.S. District Court Judge

## MEMORANDUM - DECISION AND ORDER

Plaintiff Lockheed Martin Corporation ("Lockheed"), owner of the vessel Little Toot II, brings this action to limit its liability in a companion case[1] to the value of the vessel, pursuant to the Limitation of Vessel Owner's Liability Act ("LOLA"), 46 U.S.C. § 181 et seq.,[2] specifically, 46 U.S.C. § 183(a).[3] The court has jurisdiction in this case pursuant to 28 U.S.C. § 1333.

Currently before the court are Lockheed's motion for summary judgment (Doc. No. 21), and claimant Lorraine Morganti's motion for summary judgment (Doc. No. 23).  For the reasons set forth below, Lockheed's  motion will be denied, and Morganti's motion will be granted.

---

[1]     Also before the court is Lockheed's motion for summary judgment in Morganti v. Lockheed Martin, et al., 5:02-CV-735,  Morganti's action under § 905(b) of the Longshore Act. Lockheed incorporates the companion summary judgment motion by reference in its moving papers.

[2]     46 U.S.C. 181 et seq.  was repealed effective October 6, 2006.  LOLA is now codified at 46 U.S.C. § 30505.  The controlling statute at the time of the incident was 46 App. U.S.C. 183(a), last revised by Congress in 1996.  Accordingly, the court will apply that statute in considering the facts of this case.

[3]     By order of this court (Doc. No. 4), notice was issued by publication in the local newspaper and by mail, in order to notify all persons claiming damages for any and all losses, damages and injuries occasioned by or resulting from the operations of the Little Toot II on December 20, 2000.  Lockheed obtained an appraisal for $10, 500.00, the value of the Little Toot II as of December 20, 2000 (Doc. No. 2), and posted bond for that amount with the court on June 3, 2002 (Doc. No. 3), in accordance with the requirements of LOLA.

# I.   BACKGROUND

## A.   Facts

The following facts are taken from the complaint, and are presumed true for the purpose of this motion to limit liability.  The Little Toot II is a 34 foot vessel displacing approximately 18,000 tons, with a single Detroit Diesel propulsion system, and was constructed circa 1964 by Paasch in Buffalo, New York.  At all times relevant to the case at bar, Lockheed was the owner of the Little Toot II.

On December 20, 2000, the Little Toot II was under preparation to depart from the Paganelli, a fixed platform in Cayuga Lake in the State of New York, to travel to a dock at Portland Point in the Town of Lansing, New York.  Rocco Morganti (the "decedent"), an employee of Lockheed on December 20, 2000, fell overboard from the Little Toot II and drowned in Cayuga Lake. [4]  The court assumes familiarity with the underlying facts of this litigation and will reiterate them only as necessary.

On January 10, 2002, an action was commenced in the Southern District of New York ("SDNY") pursuant to § 905(b) of the Longshore and Harbor Worker's Compensation Act, 33 U.S.C. § 901 et seq. ("the Longshore Act" or the "Act").

---

[4]      For an thorough recitation of the underlying facts of the case, See Lockheed Martin Corporation, Ace USA v. Lorraine Morganti, 412 F.3d 407, 409-10 (2d Cir. 2005).

The action was brought by Lorraine Morganti ("Morganti"), individually and as administratix of the estate of Rocco Morganti, and on behalf of all heirs and next of kin of Rocco Morganti (the "Morganti Action").  In its answer to the complaint in the Morganti Action, Lockheed asserted that Morganti is not entitled to a recovery under the Longshore Act because Cayuga Lake is not a navigable waterway, and the decedent was not involved in maritime employment.  Lockheed brought this action in the alternative, i.e., in the event the court held that Cayuga Lake is navigable, and that the decedent was involved in maritime employment.

Lockheed believes and alleges that the value of the Little Toot II on December 20, 2000, immediately after the casualty, did not exceed $10,500.00. This amount is substantially less than the amount sought in the Morganti Action. Lockheed claims, inter alia, that decedent's death occurred without the fault and privity [or knowledge] of Lockheed; that Lockheed is entitled to a limitation of any liability under the Longshore Act  pursuant to LOLA; and that the Little Toot II is not a seagoing vessel.[5]

In her notice of claim for property on behalf of the estate of the decedent

---

[5]     Whether or not the Little Toot II is a seagoing vessel is of no import to the case at bar.  46 App. U.S.C. § 188 states in pertinent part that "the provisions of section[] ... 183 .. of this title shall apply to all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges and lighters."

46 App. U.S.C. § 188 (West 2006).

(Doc. No. 10), Morganti claims an amount in excess of the $10,500.00; alleges that the decedent was a covered employee under the Longshore Act; and was in the course of his employment for Lockheed when he was caused to fall into the waters of Cayuga Lake, suffered hypothermia, and drowned.  She asserts that the following negligent acts and/or omissions by Lockheed were a proximate cause of the decedent's death, including but not limited to, a failure to inspect, maintain and repair the subject craft; a failure to properly operate the subject craft; a failure to properly train and supervise the crew of the subject craft; and a failure to equip the subject craft with appropriate safely equipment.

Morganti argues that Lockheed is not entitled to limitation of liability because (a) it failed to file its limitation complaint within six months of claim being made against it; (b) it was in privity and possessed knowledge of the negligent acts or omissions relating to the condition, operation and ownership of the Little Toot II, and (c) it failed to provide an adequate limitation fund that includes the value of the other vessels and/or adjoining structures and appurtenances thereto, including but not limited to the Paganelli barge.[6]  The Little Toot II was still connected to the Paganelli at the time of the December 20, 2000 accident.

---

[6]     The court finds that the limitation complaint was timely filed.  Because privity and knowledge of the negligent acts was found as against Lockheed, the court need not consider applying 46 App. U.S.C. § 188 to the facts of this case, in order to determine if the value of the Paganelli barge should be added to the limitation fund.

**B.    Procedural History**

On July 8, 2001, Morganti filed a claim for death benefits under the Longshore Act with the Office of Workers' Compensation Programs of the United States Department of Labor.  The Administrative Law Judge ("ALJ") denied her claim on grounds that (1) the decedent was not a maritime employee under the Act; (2) the Paganelli was a fixed platform categorized as artificial land akin to an island, so the decedent was only "transiently and fortuitously" on navigable waters and was thus outside the coverage of the Act [pursuant to the holding in a Fifth Circuit case[7]]; and (3) the decedent's job was data processing and thus specifically excluded from coverage under § 2(3)(A) of the Act.  The ALJ rejected Lockheed's argument that Cayuga Lake is not navigable.  Morganti appealed to the Benefits Review Board of the United States Department of Labor (the "Board").  On February 17, 2004, the Board reversed the findings of the ALJ, except for the finding that Cayuga Lake is a navigable waterway.  The Board awarded death

---

[7]    See Bienvenu v. Texaco, Inc., 164 F.3d 901, 909 (5th Cir. 1999) (A workman who is aboard a vessel simply transiently or fortuitously, even though technically in the course of his employment, does not enjoy coverage under the [Longshore Act], but Bienvenu's work on production equipment on-board the vessel was a sufficient amount of work time on navigable waters to trigger [Longshore Act] coverage for injuries sustained).  Bienvenu, an offshore oil platform worker, was found to have spent 8.3% of his workday working on-board the vessel that transported him to the oil platform.  Bienvenu sought compensation for injuries he sustained while tying the transport vessel to the dock, and while moving his tool box to the vessel.  In Lockheed, 413 F.3d at 414-15, the Second Circuit held that the Paganelli was not a fixed platform, thus the decedent's time on the Paganelli was time worked on navigable waterways.

benefits to Morganti.   Lockheed v. Morganti, 412 F.3d at 410.  Lockheed appealed

the Board's decision to the Second Circuit Court of Appeals, which denied the

petition and upheld the award of benefits to Morganti. Id.

Morganti commenced an action in the Southern District of New York on

January 10, 2002 under the Longshore Act to seek benefits for her husband's death

(Dkt. No. 02-CV-252).  Said action was transferred to the Northern District of New

York on May 28, 2002 (Dkt. No. 5-02-CV-735).  On June 3, 2002, Lockheed

commenced the present action pursuant to 46 U.S.C. § 183(a) to limit its liability to

the value of the Little Toot II.

## II.   DISCUSSION

### A.   Motion for Summary Judgment

A motion for summary judgment shall be granted "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

See also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986);

Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82

(2d Cir. 2004).  "[I]n assessing the record to determine whether there is a genuine

issue as to a material fact, the court is required to resolve all ambiguities and draw

all permissible factual inferences in favor of the party against whom summary

judgment is sought[.]"  See Security Ins., 391 F.3d at 83, citing Anderson V.

Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505 (1986).  "Only when

reasonable minds could not differ as to the import of the evidence is summary

judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), citing

Anderson, 477 U.S. at 250-51.

While the initial burden of demonstrating the absence of a genuine issue of

material fact falls upon the moving party, once that burden is met, the non-moving

party must "set forth specific facts showing that there is a genuine issue for trial."

Koch v. Town of Brattleboro, Vermont, 287 F.3d 162, 165 (2d Cir. 2002).  "[T]he

plain language of Rule 56(c) mandates the entry of summary judgment ... against a

party who fails to make a showing sufficient to establish the existence of an

essential element to that party's case, and on which that party will bear the burden

of proof at trial."  Celotex Corp., 477 U.S. at 322.

**B.    Limitation of Vessel Owner's Liability**

Lockheed brings its complaint pursuant to the Limitation of Liability Act,

codified (at the time of the incident) at 46 App. U.S.C. § 181 et seq., which "allows

a vessel owner to limit liability for damage or injury, occasioned without the

owner's privity or knowledge, to the value of the vessel or the owner's interest in

8

the vessel." <u>Lewis v. Lewis & Clark Marine, Inc.</u>, 531 U.S. 438, 446, 121 S.Ct. 993

(2001).  The central provision of the Act provides in pertinent part that

> [t]he liability of the owner of any vessel ... for any loss ...
> done, occasioned, or incurred without the privity or
> knowledge of [the] owner or  owners, shall not ... exceed
> the amount or value of the interest of such owner in such
> vessel, and her freight then pending.

46 App. U.S.C. § 183(a) (2006).

The Act was passed by Congress in 1851

> to encourage shipbuilding and to induce capitalists to
> invest money in this branch of industry.  This was
> necessary because [g]iven the primitive vessels and the
> hazards of the sea, the potential common law liabilities of
> the shipowner as principal made the shipping industry an
> unattractive investment.  Greater liability would result in
> greater cost.  Leaving the United States shipowner
> without protection would put him at a competitive
> disadvantage in the world shipping market.

<u>In re City of New York</u>, ---F.Supp. 2d.----, 2007 WL 610075 * 3-4 (E.D.N.Y. 2007)

(internal citations omitted).  Almost 50 years ago, Judge Learned Hand questioned

the continuing validity of the Act: "[I]t is at least doubtful whether the motives that

originally lay behind the limitation are not now obsolete ...." <u>In re United States</u>

<u>Dredging Corporation</u>, 264 F.2d 339, 341 (2d Cir. 1959).  More recently, courts

have referred to the Limitation Act as a "relic of an earlier era, provid[ing]

protections that are neither warranted or consistent with current reality." <u>Esta Later</u>

Charters, Inc. v. Ignacio, 875 F.2d 234, 239 (9th Cir. 1989).  Despite suggestions that the Act was obsolete, Congress amended it on October 6, 2006, leaving it relatively intact. See 46 U.S.C.A. § 30505 (West 2007).

In situations where, as here, the ship is owned by a corporation, "[t]he Supreme Court has ruled that ... liability may not be limited where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of business out of which the loss or injury occurred." In re City of New York at 4 (citing Coryell v. Phillips, 317 U.S. 406, 408 (1943)).  "A corporation necessarily acts through human beings.  The privity of some of those human beings must be the privity of the corporation else it could always limit its liability." Coryell, 317 U.S. 406 at 411.  "Where the level of responsibility begins must be discerned from the circumstances of each case." Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365, 1376 (5th Cir. 1983).

"[P]rivity and knowledge under the statute have been construed to mean that a shipowner knew or should have known that a certain condition existed ... The failure of a ship's master to exercise diligence in selecting, training, or supervising crew members whose navigational faults contribute to an accident is proper ground to deny limitation of liability." Potomac Transport, Inc. v. Ogden Marine, Inc., 909 F.2d 42, 46 (2d Cir. 1990).  See also Szollosy v. Hyatt Corporation, 396 F.Supp.2d

147, 159 (D.Conn. 2005) ("[A corporation] cannot limit its liability by attributing any relevant action or inaction solely to lower level employees").   "All that is needed to deny limitation is that the shipowner, by prior action or inaction, set[s] into motion a chain of circumstances which may be a contributing cause even though not the immediate or proximate cause of a casualty ...." Id. at 158 (internal quotations omitted).

A two-step analysis must be utilized to determine if a shipowner is entitled to limitation of liability.  "First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident.  Second, the court must determine whether the shipowner had actual knowledge or privity of those same acts of negligence or conditions of unseaworthiness." In re Livolsi, 2005 WL 3675967 (D.Conn. 2005).  "Moreover, once a claimant satisfies the initial burden of proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove lack of privity and knowledge." Id.  See also In re Complaint of Hercules Carriers, Inc., 768 F.2d 1558, 1563 (11th Cir. 1985); Farrell Lines Inc. v. Jones, 530 F.2d 7, 10 (5th Cir. 1976).

In its motion for summary judgment in this limitation of liability action, Lockheed posits that it was not in privity with the acts of negligence that caused the loss.  It also submits that undisputed evidence shows that the sole proximate cause

11

of the accident on December 20, 2000 was the decedent's decision to deviate from

established safety procedures that were conspicuously posted.  Specifically, the

decedent should have donned a life preserver, should have remained seated in the

cabin of the Little Toot II, and should not have exceeded the boundaries of his

employment as a test engineer by helping Agard untie the line securing the Little

Toot II to the Paganelli. Finally, Lockheed deems any other alleged acts of

negligence as irrelevant to Lockheed's capacity as a vessel owner, and were outside

the privity or knowledge of the corporation. (Doc. No. 21-8 at 2-8).  These acts

include alleged negligence in allowing the testing to go forward on December 20,

2000; the lack of life preservers on the Little Toot II on that date; the fact that a

safety rail remained in a state of disrepair after being identified in an earlier audit;

the lack of additional safety equipment which could be used in water rescue; the

failure of Agard to order the decedent into the cabin, not requiring the decedent to

wear a life preserver, not throwing the decedent a life ring, not calling for assistance

sooner, and otherwise failing to rescue the decedent.  Lockheed asserts that Agard's

actions are the type of instantaneous negligence of crew members for which vessel

owners should not be charged with knowledge or privity. Id. at 8.

In her motion for summary judgment in this limitation of liability action,

Morganti alleges that the decedent's accident was caused by acts of negligence

and/or conditions of unseaworthiness of which Lockheed had privity and knowledge.  She asserts that multiple Lockheed managers shared responsibility for the Cayuga Lake operation and knew or should have known of the numerous safety failures and inadequate policies that caused or contributed to Rocco Morganti's death. (Doc. No. 23-8 at 5).  In December of 2000, Brian Kent ("Kent") was the manager of Environmental Safety and Health ("ESH") at Lockheed, which was tasked with developing safety policies for various Lockheed operations, which included having safety systems in place on the Little Toot II and the Paganelli. Members of Kent's team inspected the Little Toot II once a year and conducted impromptu safety audits from time to time.  Greg Perra ("Perra") was acting manager of the Paganelli operation, including the operation of the Little Toot II, and shared safety responsibility with Kent.  Id. at 6.

Lee Agard ("Agard") was placed in charge of running the day-to-day operation of the Little Toot II; he reported directly to Perra.  It was Agard's responsibility to recognize if conditions on the water were unsafe and presented a hazard to himself and his passengers.  Agard was also responsible for conducting quarterly self-audits, i.e., quarterly inspections which required him to report deficiencies, necessary repairs, etc., to management.  Morganti asserts that through these direct reporting relationships between Agard, Perra, Kent and the members of

13

his team, Lockheed had privity and knowledge of the conditions on the Little Toot II on an ongoing basis. Id.

The specific allegations of negligence and unseaworthiness against Lockheed are as follows: (1) the crew of the Little Toot II lacked water rescue or water safety training; (2) Agard's negligence caused or contributed to the decedent's drowning; (3) the Little Toot II lacked proper water rescue and safety equipment; (4) the Little Toot II lacked marine weather operational guidelines; (5) Lockheed failed to require that all persons wear life preservers while on the Little Toot II at all times; and (6) the Little Toot II was in disrepair and not fit for the weather conditions it encountered.  Morganti argues that all of these deficiencies on the Little Toot II, along with Agard's negligent attempt at rescue set in motion a chain of circumstances which caused the decedent to fall in the lake and drown. Id. at 5-10. Lockheed counters that the decedent's failure to abide by the posted safety procedures was the sole proximate cause for the accident that resulted in his death.

A brief recitation of the events surrounding the accident on December 20, 2000 is warranted to contextualize and clarify Morganti's allegations of negligence and/or unseaworthiness.  Decedent was working for Lockheed on the Paganelli research vessel, testing sonar transducers in deep water.  Decedent traveled between Lockheed's dock at Portland Point to the Paganelli on Lockheed's work boat, the

14

Little Toot II.  Agard was the captain of the Little Toot II, and had been for

approximately 18 years.  At the end of the work day at approximately 4:15 p.m., the

decedent and Agard prepared to leave the Paganelli.  The waves on Cayuga Lake

were approximately two to three feet high, the wind was at 20 knots and the air

temperature was approximately 20 degrees F.

The lines securing the Little Toot II to the Paganelli had iced up, and ice

covered most of the Little Toot II's deck.  The decedent, although only a passenger,

helped Agard remove the forward mooring line through the cabin window, then left

the cabin to remove the aft mooring line on the stern of the boat.  Shortly thereafter,

a wave hit the boat and the decedent fell overboard.  Agard went to the stern of the

boat and observed the decedent in the water, hanging on to the rope attached to the

aft port cleat.

Agard first tried to retrieve the decedent from the frigid waters by reaching

down to grab him, but Agard could not lift the decedent.  Agard then went back

onto the Paganelli to get a ladder to try to get the decedent out of the water.   The

first ladder Agard selected and tied to the side of the Paganelli was too short, and

Agard went back inside the Paganelli a second time to get a longer ladder.  By the

time Agard secured the second ladder to the side of the Paganelli with rope, the

decedent had been in the frigid water for approximately 15 minutes.  The decedent

15

initially grabbed the ladder, and with Agard's assistance, started to climb up, but then lost strength and Agard was unable to pull him to safety.  The decedent fell back into Cayuga Lake and drowned.  (Doc. No. 23-8 at 4-5).

When rescue personnel arrived at the shore of Cayuga Lake, Agard brought the Little Toot II to shore and picked them up.  An assistant chief of the Lansing Fire Department asked Agard for a life jacket and was told by Agard that there were none on the boat.  Due to the ice on the vessel's deck, and the high winds and waves on the lake, the assistant chief and another firefighter tied themselves to a post in the middle of the deck to protect themselves from being thrown overboard. A deputy sheriff from the Tompkins County Sheriff's Department who was in the pilot's house with Agard confirmed that there were no life jackets on the bench in the pilot house, where they were allegedly stored. Id. at 5.

## III.   ANALYSIS

### A.   Allegations of Negligence or Unseaworthiness.

#### 1.      The crew lacked water rescue or water safety training.

Morganti asserts, and the depositional testimony of Lockheed employees confirms, that Lockheed never provided Agard with any boater safety or water rescue training before the accident.  In fact, prior to the accident, Morganti alleges that Agard had never practiced as much as throwing a life ring to a man overboard.

Agard's only training for his position was casual, on the job instruction from another Lockheed employee over 20 years ago.  Lockheed's stated policy was that the operator of the Little Toot II was required to take a safe boating course, but Lockheed never confirmed and has no record that Agard ever took such a course. (Doc. No. 23-8 at 11) (referencing Perra, Agard, and Kent depositions).

> ### 2.      Agard's negligence caused/contributed to decedent's drowning.

Morganti next states, with confirmation by Lockheed supervisors Kent and Perra,  that despite a written safety policy posted in the cabin of the Little Toot II, in the form of an Emergency Checkoff list,[8] Agard failed to instruct the decedent to sit in the cabin instead of allowing him to assist Agard in undoing the mooring lines. This is alleged as a contributing cause of the accident, as was Agard's failure to

---

[8]      Entitled the "Little Toot II Emergency Checkoff List," the document stated, in pertinent part, that:

> In the Event of Rough Weather
> All weathertight and watertight doors and hatches closed
> Bilge pump on, bilge kept as dry as possible
> Passengers seated and evenly distributed
> All passengers wearing life preservers
> Distress call if assistance needed
>
> In the Event of Man Overboard
> Ring buoy thrown overboard close to victim
> Lookout posted to keep victim in sight
> Crewmember standing by, wearing life preserver and lifeline, ready to assist victim.
> Any assisting parties notified if possible (i.e., Coastguard, State Police)
> Continue search until consultation with any assisting parties

throw the decedent a ring buoy which was mounted on the cabin of the Little Toot

II.  In addition, Agard failed to recognize the rough weather conditions, and allowed

operation of the Little Toot II in inclement weather conditions.  Perra also faults

Agard for failure to ensure that Morganti was wearing a life preserver.  (Id. at 11)

(referencing Perra and Kent depositions).

### 3.    Little Toot II lacked proper water rescue/safety equipment.

Morganti maintains that the Little Toot II lacked essential water rescue

equipment which would have prevented this tragedy.  The vessel lacked rescue

equipment which could have been used to get the decedent out of the water.  There

was no rescue ladder installed on the Little Toot II which would have expedited a

water rescue.  There was no davit, or crane, which in conjunction with a life sling is

used to pull someone out of the water.  There was no life hook, which is used to

guide persons in the water close to the vessel to facilitate a water rescue.  The Little

Toot II lacked a mid-rail on its safety railing, and it lacked any safety rails on its aft

end, which would likely have prevented the decedent from falling overboard.  The

vessel also lacked a slip resistant surface which would have enhanced its safety.

(Id. at 12) (referencing Perra and Kent depositions).

### 4.    Little Toot II lacked marine weather operational guidelines.

Morganti argues that Agard was also responsible for making weather related

18

operational decisions.  Lockheed, however, provided no guidelines as to what constituted weather conditions that were too poor to take the Little Toot II out to the Paganelli or back to shore.  Similarly, Lockheed's policy which required the use of life preservers only in rough weather provided no guidelines as to what constituted rough weather.  There was no requirement that Agard obtain a weather report prior to departing for the barge or prior to leaving the barge for shore on board the Little Toot II. (Id. at 12) (referencing Perra, Agard, and Kent depositions).

### 5.    Lockheed did not require life preservers to be worn at all times.

Prior to the accident, Morganti alleges, Lockheed did not require that all persons wear life preservers at all times on board the Little Toot II, which was contrary to the industry standard and federal requirements.   Lockheed was cited and fined by the Occupational safety and Health Administration ("OSHA") for failing to have such a policy in place.  At the time of the accident, neither Agard or the decedent were wearing a life preserver. (Id. at 13) (referencing Collins deposition, OSHA Citation, and Lockheed's Accident Investigation Report).

### 6.    Little Toot II was in disrepair, unfit for the weather conditions.

Finally, Morganti asserts that Lockheed was aware for over a year before this drowning that the safety railings on the Little Toot II had been broken and were not repaired.  Agard was charged with repairing the safety railings which were damaged

in October of 1999 but did not complete the repairs because of his work schedule. The broken safety railing, which was on the port side right near where the decedent was untying the mooring line, left a dangerous gap. (Id. at 13) (referencing Agard, Mix, and Perra depositions).

Morganti argues that all the deficiencies on the Little Toot II listed above, along with Agard's negligent attempt at rescue, set in motion a chain of circumstances which resulted in Rocco Morganti's death. She argues that controlling law dictates that Lockheed cannot limit its liability under these facts.

The court must first determine what acts of negligence and/or conditions of unseaworthiness, if any, caused the accident. The court turns to the Environmental Safety and Health Procedure ("ESH Procedure"), which governed safety procedures at the Paganelli facility. (Doc. No. 21-4, exhibit A). The ESH Procedure was developed in 1998 by members of the Lockheed Environmental Safety and Health Organization ("ESH"), in conjunction with Perra, who was, at the time, Acting Manager of Engineering Labs and Materials, with responsibility for the Paganelli research barge and the Little Toot II. (Doc. No. 21-4 at 1). On December 20, 2000, Kent was manager of ESH. It is evident with even a cursory glance at the procedures that the scenario of a man overboard and of a subsequent drowning was present in the drafters' minds when the procedure was developed. Requirements

were set forth for life preservers to be available on both the Little Toot and the Paganelli; each vessel was required to have at least one life ring; accident reporting forms were provided to be filled out in the event of injury or death, outlining procedures to follow in the event a person is injured, dies, or is missing from the vessel.

It is also evident to the court that the ESH procedures were wanting. Although there was no written requirement on the Emergency Checkoff List that a weather report should be obtained before operation, the accident reporting form asks for "[w]eather reports available to and used by the operator before & during the operation of the vessel."   Further, there is no mention of any viable rescue procedures, beyond tossing the lone life ring, in the event someone falls overboard, nor is there any mention of water rescue training being required by the crew.

Considering even the small quantity of relevant ESH Procedures actually set forth on the Little Toot Emergency Checkoff List, it appears that few if any of them were followed.  The passenger was not seated, nor was he wearing a life preserver. No distress call went out until after the decedent was missing and presumed drowned.  No ring buoy was thrown to the victim.  The record before the court does not indicate that the search was continued until consultation with assisting parties. Despite an implied but unstated requirement for at least two crewmembers to be

21

present ("Lookout posted to keep victim in site; [c]rewmember standing by, wearing life preserver and lifeline, ready to assist victim), only one crewmember was present, and that crewmember was also without a life preserver.  The ESH Procedure clearly states that a manager shall "[e]nsure operator has completed a safe boating course."  This requirement was also unadhered to.

On May 1, 2001, Lockheed was issued an Occupational Safety and Health Administration ("OSHA") citation for, inter alia, failure to require life preservers to be worn on the exterior walkways and around the center well of the Paganelli Research vessel, and on the Little Toot II vessel on December 20, 2000.[9]  Thus, the Lockheed safety policy in effect that did not require employees to wear life preservers at all times on the Little Toot II, formulated by Lockheed managers and employees, violated federal OSHA requirements.  Lockheed's policy requiring that employees wear life preservers on the Little Toot II only during rough weather failed to set guidelines for its employees to determine rough weather.   Lockheed's procedures set into motion a chain of circumstances which may be a contributing cause of the casualty.  The court finds that negligence caused or contributed to the

---

[9]      The citation was later amended by stipulation, with the Paganelli portion of the violation withdrawn, and the classification changed from "serious" to reflect an "unclassified" violation. (Doc. No. 23-7 at 17-18).

decedent's death, satisfying part one of the two-part analysis.[10]

**B.      Did Shipowner Have Privity or Knowledge of these Acts?**

The second part of the two-part analysis dictates that the court determine

whether Lockheed had privity or knowledge of the negligence that contributed to or

caused the accident.  As a threshold matter, the court is tasked with determining if

Kent and Perra were managerial employees or merely ministerial employees for the

purpose of imputing privity or knowledge to the corporation.  As stated above,

Perra was the manager responsible for the Paganelli and the Little Toot II.  Agard

was responsible for the day-to-day operation of the Little Toot II and reported

directly to Perra.  Further,  Perra acknowledged responsibility for Agard's actions,[11]

and accordingly, as a manager responsible for the Paganelli operation, his privity

and knowledge of the safety issues referenced herein are imputed to the corporation.

On December 20, 2000, Kent was the manager of the ESH, and although

Agard did not report to him,[12] he acknowledged that Agard did not follow the ESH

---

[10]      In its reply, Lockheed asserts that "unseaworthiness" is no longer a basis for
recovery under the Longshore Act.  (Doc. No. 25 at 2). Because the court finds negligence, the
court need not address the issue of the possible unseaworthiness of the Little Toot II.

[11]      Q. [Attorney Rose]:    "And ultimately your responsibility for one of your
employees to fail to abide by the check-off list or the ESH 7.15 procedure, rests with the manager
of the Paganelli situs, correct?"
          A. [Perra]:        "Correct." (Perra Deposition: 117:7-11).

[12]      Members of Kent's ESH team, however, did safety inspections on the Little Toot
II, and reported to Kent.  Agard also completed self-audits which were returned to ESH. (Kent

Procedures that were in place.  Kent testified that Agard's actions, or failure to act, contributed to the decedent's death: "I think he failed to recognize the rough weather.  I think he failed to require a passenger -- per the procedure -- to sit inside the cabin of the Little Toot, and I think he failed to throw him a life ring that was available at the time, and I think he failed in wearing a life preserver himself in rough weather as the requirement was."  (Kent Deposition: 22:10-22).

Morganti asserts that because Lockheed negligently failed to provide, in Agard, a competent operator of the vessel, it cannot avail itself of a limitation of liability.  Because Lockheed was responsible for Agard's training, or lack thereof, it cannot deny privity or knowledge.  Lockheed argues that knowledge and privity of employer negligence is irrelevant to Longshore Act claims.  The court disagrees.  In a case in this circuit which is directly on point, the court held that a corporation's "admission that its personnel failed to abide by [certain] safety procedures is sufficient to establish 'inaction' within its 'privity and knowledge' for the purpose of defeating the limitation of liability defense." Szollosy, 396 F.Supp.2d at 159 (citing Potomac, 909 F.2d at 46 for the premise that 'the failure of a ship's master to exercise diligence in selecting, training, or supervising crew members whose navigational faults contribute to an accident is proper ground to deny limitation of

---

Deposition 81: 2-10).

liability").

The court finds that, pursuant to controlling Second Circuit precedent, the actions and/or inactions of Lockheed's employees caused or contributed to the accident which claimed the life of decedent Rocco Morganti.[13]  By virtue of the managerial employees, including Perra, who supervised Agard and to whom he reported, and Kent, who knew or should have known about the safety concerns on the Little Toot II,  knowledge and privity is imputed to the corporation Lockheed Martin.  The burden of proof is on Lockheed to prove that they did not have privity or knowledge of the chain of circumstances leading to the negligence surrounding the decedent's death.  The court finds that they have not met that burden.

## IV.   CONCLUSION

For the reasons set forth above, Lockheed's motion for summary judgment on the limitation of liability claim (Doc. No. 21) is hereby DENIED.  Morganti's motion for summary judgment on the limitation of liability issue (Doc. No. 23) is hereby GRANTED.

SO ORDERED.

March 29, 2007

_____
Neal P. McCurn
Senior  U.S. District Judge

---

[13]     The issue of decedent's own negligence, if any, is a question for the trier of fact in the companion case (the Morganti Action).